MARTIN KEEFE *vs.* WILLIAM L. BRAMHALL ET AL.

EQUITY. No. 8712.

{ Decided March 16, 1885.
{ The CHIEF JUSTICE and Justices WYLIE and JAMES sitting.

1. A tax deed on its face amounts to nothing as proof of title until authority for making the deed is shown.

2. Where one enters claiming under color of title, and by length of adverse possession, gains a good title, he will hold according to the metes and bounds set out in his colorable title, although his actual possession has extended only to a part of the land claimed, and that is the only effect of color of title.

3. But, where the entry in the first instance is that of a mere trespasser, without colorable title, his adverse possession of twenty years gives him title only to the land he has actual possession of.

4. A tax deed void on its face does not even give a color of title.

5. Recording a void tax deed, and paying the taxes on the property, are not acts amounting to adverse possession.

6. The Statute of Limitations, in force in this District, in respect of real property is that of 21 James, chap. 1, section 16, and under it there must be twenty years actual, open, notorious, visible adverse possession against all the world.

7. Equity will never intefere between two claimants to a piece of real estate, for the purpose of quieting title, unless the complainant shows a clear and indisputable title, but will leave him to any other remedy that he may have.

8. Equity will not presume strongly in favor of a tax title. A party who purchases a tax title, purchases with full knowledge that he is running a risk, and he is bound to know whether the tax title is good or not. He buys with his eyes open, and to no person does the rule *caveat emptor* apply more than to such a purchaser.

9. There is no presumption in favor of the validity of a title descended from a deceased ancestor unless the latter died seized of the property.

### STATEMENT OF THE CASE.

The plaintiff being in possession filed his bill, September 19, 1883, to quiet title to the west half of lot three in square 780, in the city of Washington. He avers that he acquired title thereto by deed from Wm. B. Todd and wife, of July 8, 1870, and Todd acquired title by deed from Caroline H. Earl, of June 15, 1849, and she took under decree of partition of the estate of James McCormick, jr., of the Baltimore County Court, January term, 1846, and he derived title by tax deed from the corporation of Washington

city of May 12, 1841, the property having been sold November 19, 1827, for taxes for the years 1824, 1825 and 1826.

Two of the defendants are sued as trustees, and the others as the alleged heirs of James S. Stephenson, who died in the city of Washington about the year 1811. The bill alleges that the latter defendants claim to have inherited this property, together with a large quantity of other property in the city of Washington, from their said alleged ancestor, Stephenson, and undertook and pretended to convey an undivided half interest in the same to Anna T. Bramhall, wife of defendant Bramhall, by deed of November 23, 1882, the consideration recited being $500. The bill avers that this conveyance was without any consideration, in fact is a fraud, and the property therein conveyed is actually worth many thousand dollars. And that the same defendants conveyed, or pretended to convey the other half interest in the same property to defendant, William L. Bramhall, by deed of the same date.

That Bramhall and wife, thus possessed of this half lot and some eighteen or nineteen other original lots, all situate in the city of Washington, reconveyed the same to the defendants herein named, the said grantors in the two deeds mentioned, by deed of February 17, 1883; and by deed of same date, they, in turn, conveyed to Bramhall and Baker, trustees.

That the title to plaintiff's property is thus clouded by these pretended conveyances, and that defendants refuse to bring an action of ejectment to try their pretended title. The plaintiff being without any adequate remedy at law, therefore brings his bill in equity to quiet the title to the property in controversy, and asks for judgment against the defendants for damages in the sum of $250.

The defendants answering averred that the title of the plaintiff was founded on a tax title, and was null and void, and the record so showed the same; that the said west half of lot 3, square 780, was not inclosed, nor was any dwelling erected thereon until 1870; they denied that the plaintiff and those under whom he holds have paid taxes thereon for

more than fifty years, and have exercised all the rights of property in and to the same against all persons, and particularly against the defendants, as alleged in the bill; that said lot was vacant, unoccupied, uninclosed, and in the possession of no one until 1870, when the plaintiff took possession and erected a humble dwelling thereon; that the other defendants are grandchildren of the said James S. Stephenson, who died about the year 1811, and that they inherited, among certain other lots, the property in question, and they show a regular sequence of conveyances from the original proprietor to their ancestor.

The conveyances to Bramhall and wife, and reconveyance to the defendants, and their conveyance to Bramhall and Baker, trustees, as alleged in the bill, were admitted; but they averred that the conveyances to Bramhall and wife were for a valuable and sufficient consideration, and divested of all fraud, and allege that upon conference with the parties interested the said Mrs. Bramhall reconveyed for a full compensation to be paid, &c.; that the trustees have and possess a fee simple, title in and to the lot mentioned for the purposes of the trust; but, notwithstanding this, the defendant, Bramhall, offered to give the plaintiff a quit claim deed for $100.

Issue was joined, and testimony being taken, the proof showed that the lot was purchased by the plaintiff of William B. Todd, in 1870, when it was a vacant lot, and it appears to have remained a vacant lot, uninclosed, from date of tax sale to date of sale by Todd to plaintiff in 1870, when the plaintiff erected a small dwelling thereon; that this property, with the adjoining lots, was a common, wholly unimproved until the Board of Public Works graded D street. The excavation in front of the lot made, in grading the street, is, or was, about seventeen feet deep. The property, as it stood, cost the plaintiff about $2,500, and was fairly worth $1,500. The taxes were paid up to date, the plaintiff having paid them since his purchase of Todd. The property was assessed since the tax sale or deed in the name of McCormick, Todd and the plaintiff. The defendants

since the tax sale have never paid any taxes on the property.

The tax sale took place in 1827; was for taxes due for the years 1824, 1825 and 1826. The price paid for the whole lot (of which only one-half was in controversy) was $2.83. The tax deed under the sale was not given until about fifteen years afterwards, to wit, May 12, 1841. The bill did not allege that the tax deed was a valid one, but averred "that said tax deed is at all events at least a colorable title, and the complainant and his grantors having claimed thereunder for more than forty years, and having asserted all the while a right of property in the same as against all persons, and particularly as against the defendants, or either of them, and all persons who claim under, by or through them or either of them, he claims an indefeasible estate in and to said lot and premises."

At the hearing in Special Term the court dismissed the bill "without prejudice to either party proceeding at law."

J. G. BIGELOW for complainant:

The defendant's conveyances cast a cloud upon the plaintiff's title, who, being in possession, of course has no remedy at law against the defendants, and is, therefore, compelled to seek redress in a court of equity. This court unquestionably has jurisdiction. Pierce *vs.* Webb, 3 Bro. Ch., 16; Hayward *vs.* Dinsdale, 17 Ves., 111; Byne *vs.* Vivian, 5 Ves., 606, 607; Mayor of Colchester *vs.* Lowton, 1 Ves. & B., 244; Attorney General *vs.* Morgan, 2 Russell, 306; Duncan *vs.* Worrall, 10 Price, 31; Jackman *vs.* Mitchell, 13 Ves., 581; Petit *vs.* Shephard, 5 Paige, 493; Van Doren *vs.* Mayor, &c., of New York, 9 Paige, 388; Fish *vs.* French, 15 Gray, 520; Sherman *vs.* Fitch, 98 Mass., 59; Sullivan *vs.* Finnegan, 101 Mass., 447; Bunce *vs.* Gallaher, 5 Blatch. C. C., 48; Clonston *vs.* Shearer, 99 Mass., 209; Woods *vs.* Monroe, 17 Mich., 238—all cited in note 4, to section 700, Story's Equity Jurisprudence; and, Eldridge *vs.* Smith, 34 Vt., 484; Hodges *vs.* Griggs, 21 Vt., 280, cited in note to section 711*a*, Story's Eq. Jurisprudence.

These authorities effectually dispose of the question of jurisdiction.

The main question in the .case, one purely of law, arises out of the following uncontroverted state of facts: James S. Stephenson, the ancestor of the beneficial defendants, died in the city of Washington about the year 1811, seized in fee simple to the lot in question. None of the defendants have labored under the disability of coverture, infancy, insanity, or any other disability to prevent the running of the Statute of Limitations.

The plaintiff's title is founded; first, in a tax title to McCormick of 1841; and second, in a decree of partition of his estate by the Baltimore county court, January term, 1846, assigning this particular property with certain other to Caroline H. McCormick, who afterwards intermarried with Earl. Then the property, by deed in fee simple from her of 1849, is conveyed to the late William B. Todd, deceased, and Todd conveys by like deed of 1870 to the plaintiff.

The lot in controversy is situated in square 780, fronts south on D street north, between Third and Fourth streets east. No public street or highway was opened up past this property or to it until the time of the Board of Public Works. It contains about 2,000 square feet of ground, and the excavation in front of it made by the said Board in grading D street was about seventeen feet deep. It, together with adjoining lots, remained a common, uncultivated, unimproved and uninclosed down to the year 1870, when the plaintiff, having purchased of Todd, erected a small frame dwelling thereon, before the grading of the street. After the street was graded, the plaintiff excavated the lot, and brought it down to the grade of the street, and built an additional story of brick under his house. This excavation and underpining of his lot and house cost the plaintiff over one thousand dollars. The title of this lot has stood on the land records of the District in the name of the plaintiff and those under whom he claims, and been assessed and taxed for the purposes of the municipal government of the city of. Washington and District of Colum-

bia, in their names, ever since the tax deed of 1841. The taxes have been paid by the plaintiff since 1870, and prior thereto they were presumably paid by Todd, and those under whom he held. At least they were not paid by the defendants. It may be stated as an obvious fact that this lot was never worth anything for agricultural or horticultural purposes to induce the owner to inclose it by a fence, or for the purposes of a building site, being inaccessible by any public improved highway or street, until the time of the Board of Public Works.

The facts are fairly stated, and the sole question is: Has the plaintiff a good title against the defendants? Has the Statute of Limitations barred the rights of the defendants to claim this lot?

The common law doctrine, requiring twenty years uninterrupted adverse occupation of real estate or land by an actual *pedis possessio* of it by fence inclosure, an actual cultivation, an actual improvement, or by an actual possession, in order to acquire title against the owner, is familiar to all.

The doctrine and the rule had their origin in the feudal system long before written deeds of conveyance were heard of, before charters and deeds of foeffment as memorials of the fact of livery of seisin were thought of; long before the establishment by law of public records for the recordation of land titles. The origin was at a time when the only method and means, recognized by the law as effectual to transfer the title to land, consisted of the ceremony called livery of seisin, performed in the presence of the assembled vicinage, when the grantor inducted the grantee into possession by the delivery of the symbolical twig and turf.

It is obvious that under such a system of acquisition and tenure of title, no adverse claim could be recognized, unless founded upon actual, open and notorious occupation or possession, for it was by such occupation or possession alone the fact of ownership could be determined. There were then no land records, as at the present day, in which title might be traced from one generation to another. But the

common law in this, as well as in all other respects, has been found plastic, moulding and adapting itself to t e necessities and wants of man in a more enlightened and progressive age. Still retaining the original principle upon which it is founded, viz., public notoriety, it, nevertheless, no longer requires, in all cases, as a *sine qua non*, actual occupation by fence inclosure, cultivation, improvement or actual possession for twenty uninterrupted years to acquisition of title as against the owner.

Mr. Justice Baldwin said: "It is well settled that to constitute an adverse possession, there need not be a fence, building or other improvement made; it suffices for this purpose that visible and notorious acts of ownership are exercised over the premises in controversy for twenty-one years after an entry under claim and color of title. So much depends on the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule adapted to all cases. But it may, with safety, be said that where acts of ownership have been done upon land, which from their nature indicate a notorious claim of property in it, and are continued without interruption or an adverse entry by him for twenty-one years, such acts are evidence of an ouster of a former owner, and an actual adverse possession against him, if the jury shall think that the property was not susceptible of a more strict or definite possession than had been taken and held. Neither actual occupation, cultivation or residence are necessary to constitute actual possession, where the property is so situated as not to admit of any permanent useful improvement, and the continued claim has been evidenced by public acts of ownership such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim." Ewing *vs.* Burnett, 11 Pet., 52, 53.

(NOTE.—In Tyler on Ejectment, p. 892, the above is incorrectly quoted in the last two lines.)

Mr. Justice Story said: "The object of the law in requir-

ing actual seisin, was to evince notoriety of title to the neighborhood and the consequent burthens of feudal duties. In the simplicity of ancient times there were no means of ascertaining titles but by visible seisin, and, indeed, there was no other mode between subjects of passing title but livery of the land itself by the symbolical delivery of turf and twig. The moment that a tenant was thus seized he had a perfect investure, and if ousted could maintain his action in the realty, although he had not been long enough in possession even to touch the esplees. The very object of the rule, therefore, was notoriety to prevent frauds upon the land and upon the other tenants. But in a mere uncultivated country, in wild and impenetrable woods, in the sullen and solitary haunts of wild beasts of prey, what notoriety could an entry, a gathering of a twig or an acorn, convey to civilized man at a distance of hundreds of miles? The reason of the rule could not apply to such a state of things, and *cessante ratione cessat ipsa lex.* We are entirely satisfied that a conveyance of wild or vacant lands gives a constructive seisin thereof in the deed to the grantee. It attaches to him all the legal remedies incident to the estate." Green *vs.* Liter, 8 Cranch, 249. See also Ellicott *vs.* Pearl, 10 Pet., 412; Tyler on Ejectment, 892.

"When an entry is made upon lands under color of title, the same may be held by *constructive* possession; but if made under a simple *claim* of title, the possession must be actual, a *pedis possessio*, definite, positive and notorious." Tyler on Ejectment, p. 893, citing Bailey *vs.* Irley, 2 Nott & McCord, 343; Gibson *vs.* Martin, 1 Harr. & Johns., 545; Hoy *vs.* Perry, 1 Litt., 171; Hite's Heirs *vs.* Schrader, 3 Ib., 456; Braxdale *vs.* Speed, 1 Marsh., 106; Smith *vs.* Mitchell, Ib., 207; Skyle's Heirs *vs.* King's Heirs, 2 Ib., 585; Anderson *vs.* Turner, 3 Ib., 133; Bodley *vs.* Coghill's Heirs, Ib., 615; Moore *vs.* Farrow, Ib., 49; Trotter *vs.* Cassady, Ib., 366; Doolittle *vs.* Lindsey, 2 Aikin, 155; Tyler on Ejectment, pp. 895, 896, and cases cited.

In delivering the opinion of the court in the case of Owings *vs.* Tiernan's Lessee, 10 Peters, 442, Justice Story

said: "It is wholly unnecessary for us to consider whether the instruction as given is maintainable in point of law or not, and the only question is, whether the refusal to give it as prayed for was correct; but this resolves itself into the point whether it is absolutely necessary to constitute a possession of land sufficient to bar an adverse title thereto under the Statute of Limitations limiting writs of right to thirty years, that there should be an actual residence or fence by the party claiming the benefit of the statute; that is, an actual residence on the land, or a *pedis possessio* of it by an inclosure. The argument in support of the instruction, as prayed, assumes that there can be no possession to defeat an adverse title except in one or other of these ways—that is, by an actual residence or an actual inclosure, a doctrine wholly irreconcilable with principle and authority. Nothing can be more clear than that a fence is not indispensable to constitute possession of a tract of land. The erection of a fence is nothing more than an act presumptive of an intention to assert an ownership and possession over the property; but there are many other acts equally evincive of such intention of asserting such ownership and possession, such as entering upon land and making improvements thereon, and raising a crop of corn, &c., under color of title."

"And a deed or some writing sufficient in form to carry the title to lands, when a title in fact exists, is an essential ingredient in a constructive adverse possession, set up to bar a recovery in an action of ejectment." Tyler on Ejectment, 895, and cases cited.

Such appears to be the law when the claim is founded in a colorable title, that is, on a written instrument sufficient on its face to pass the title, or when founded, as hereinafter shown, on a judgment or decree of a court having jurisdiction. If, however, there be no such written instrument, judgment or decree, on which to found the claim, the law requires actual possession, cultivation, improvement or inclosure for the requisite period to bar the rightful owner. Speaking on this point, Tyler on Ejectment, p. 891, says: "But it must be considered as settled, if a series of decisions

for sixty years can settle a question, that when the occupant of land produces no written title, but relies solely on possession with an assertion of title, he can retain so much only as he had under actual improvement and within a substantial inclosure. And the decisions are that the possession must be marked by distinct boundaries." Citing Brandt vs. Ogden, 1 Johns., 156; Jackson, 5; Water, 12 Ib., 365; Jackson vs. Warford, 7 Wend., 62; Jackson vs. Halstead, 5 Cow., 216.

" The doctrine seems to be, that when an usurper enters on land, he acquires possession, inch by inch, of the part which he occupies, and that a mere naked possession, without color of title, is adversary only to the extent of actual inclosures, which must be definite and notorious." Tyler on Ejectment, 894; Hammond vs. Warfield, 2 Harr. & Johns., 151; Hall vs. Gitting's Lessee, Ib., 380; Jackson vs. Camp, 1 Cow., 605; Prevost's Heir vs. Johnson, 9 Mart., 123; Davidson's Lessee vs. Baker, 3 Harris & McHenry, 621.

As to claim founded on a judgment or decree, see notes to Ewing vs. Burnet, 11 Peter, 41; Book 9, L. C. P. Co.

Tax title is, of course, a colorable title. Blackwell on Tax Titles, 566, 567.

If any authorities can be found not in harmony with the principles laid down in the foregoing cases, it will be found, upon examination, that they exist by reason of some statute prescribing what shall be deemed adverse possession. In some of the States such statutes have been enacted.

Applying the doctrine therein laid down to the case at bar, we find that the plaintiff, and those under whom he claims, have exercised all the rights of property in and to the lot in controversy since the year 1841, that any rightful owner would have exercised, considering the situation of the property and the purposes for which it was adapted; that he and his grantors have claimed openly and notoriously the same under and by virtue of the tax deed of 1841, and the decree of the Baltimore County Court, January Term, 1846, for forty years, and under color thereof have paid taxes thereon; that during all this time, the title has stood in their names on

the public land records of the District of Columbia, and been assessed and taxed in their names on the books of the municipal corporation; that the most evincive acts of ownership have been exercised over said property by them, viz., the deed in fee simple of Caroline H. Earl of 1849 to Todd, and like deed of Todd of 1870 to the plaintiff, and the improvement thereof by the plaintiff at the earliest practicable moment, by the erection of a dwelling thereon as soon as it was determined by the District government to open "D" street so as to give ingress to and egress from the property; that all these acts and deeds were performed and done under a clear claim of right founded upon a written deed sufficient on its face to carry the title, and on a decree of a court of competent jurisdiction.

Assuming that the tax deed has some inherent defect by reason of a failure on the part of the municipal authorities to comply in some slight respect to the strict requirements of the law, can it be doubted in the light of the authorities the plaintiff has a good and valid title as against the defendants after the lapse of more than forty years? The tax deed need not be valid to give colorable title. If it were absolutely valid, then there could exist no need of invoking the aid of the Statute of Limitations. The plaintiff will rest his case upon the law, and without considering the presumptions of the law in respect to the observance of the letter of the law in the making of a tax deed forty-three years ago. The very principle upon which the doctrine of acquiring title to land by adverse claim, viz., notoriety of the claim, conspicuously exists in this case. The registry laws of the District remands the public to the land records to ascertain who claims title to any particular lot within this jurisdiction, and no longer do we look to see whether a fence incloses a building lot, or even to see who is actually in possession, if we find a title of record, coming regularly down by a connecting chain of conveyances extending back for more than a half a century.

A little common sense and good reason will harmonize all this with the doctrine of feudal times on the same subject.

The plaintiff, it is submitted, is clearly entitled to have the prayers of his bill granted, viz., to have the hostile deeds cancelled, decreed to stand for naught, himself to be reinvested with his title, and the defendants enjoined, &c.

W. WILLOUGHBY for defendants:

It will be noted that the taxes for which it is alleged the property was sold, were for the years 1824, 1825 and 1826 ; that is, at least fifteen years before the date of the deed, the sale for taxes having taken place in the year 1827, fourteen years before the date of the deed. Is it not a significant fact that the purchaser did not ask for his deed for the period of twelve years after the time allowed by law for redemption ? He did not seem to think it of much importance, as he did not take the trouble to have it recorded until April 12, 1842, a year after its execution, which, under the statute then in force, renders it worthless upon the face of the record. See Greenleaf's Lessee *vs.* Birth, 6 Peters, 314; Rev. Stats., 1838, chap. 57 ; Act of April 20, 1838.

A tax deed not valid upon its face, is not a colorable title. 11 How., 424; Blackwell on Tax Titles, 567–8.

But the alleged colorable title has other more apparent defects: The next thing in their chain of title is an extract from a decree in partition of the Baltimore County Court, Maryland, of an estate (alleged by complainant to be that of James McCormick, jr.) in 1846. It is not easy to see how, under the statutes, proceedings in a court in Baltimore county, Maryland, which provides for a partition of an estate within the county where the court is held, can determine title to real estate in the city of Washington, in the District of Columbia.

In 6 Cranch, 148, it is held that a court of equity may exercise jurisdiction in relation to lands outside of the State in a case of fraud, trust or contract, where it obtains jurisdiction over the parties. But it has no jurisdiction as to lands outside the State, in a case of unmixed question of title. Still less could this be so where the subject is of a statutory nature, and is purely *in rem.*

Such decree does not, therefore, furnish even color of title. It does not do this for other reasons. The extract does not describe the property as in Washington. Again, it does not appear that the said Caroline H. McCormick, therein mentioned, is an heir of James McCormick, jr., nor does it appear how she derives title from James McCormick, jr. This Caroline H. Earl conveyed her interest to William B. Todd, in the year 1849. He held it twenty-one years, and then conveyed to the complainant, July 8th, 1870.

Now, it is agreed that there was no occupation of this property by any one through whom the complainant claims, and he did not occupy it until after his purchase in the year 1870. He claims that there was no public improved highway until the time of the Board of Public Works. The highway was, however, laid out, and in common use, long before, and there was no obstacle to its occupation by any one who desired to occupy it. In fact the complainant, himself, testified that he erected a dwelling house upon the property prior to the change of grade by the Board of Public Works.

The entire ground of complainant's claim of title is adverse possession. Such adverse possession, prior to 1870, is based solely upon what is alleged to be the presumption that the taxes prior to 1870 were paid by Todd, who is claimed to have held a colorable title from 1849 to 1870, a period of twenty-one years. There is no evidence as to who paid such taxes, and it is admitted that there was no occupation whatever by Todd, nor by complainant, nor any one through whom he claims to have derived title.

The complainant quotes from Tyler on Ejectment, 893, that when an entry is made upon lands under color of title, the same may be held by constructive possession.

"To constitute adverse possession, there must be a visible, notorious occupation, a *possessio pedis*, attended with a manifest intent to hold it against the claim of all other persons." Angell on Limitations, secs. 391, 395.

The distinction between a mere intruder and one holding under color of title, is simply that the possession of the

former is confined to the land actually in occupation; the latter is co-extensive with the premises described in the paper under which he claims, and which he believes gives him a good title. Angell on Limitations, sec. 400.

"Constructive possession is an incident of ownership, and results from title, and is in no way applicable to a case where the the occupant defends himself avowedly and exclusively on the ground of his own wrong." Angell on Limitations, sec. 394.

"The principle on which the Statute of Limitations is predicated, is not that the party in whose favor it is invoked has set up an adverse claim for the period specified in the statute, but that such adverse claim is accompanied by such invasion of the rights of the opposite party as to give him a cause of action, which having failed to prosecute within the time limited by law, he is presumed to have extinguished or surrendered. * * * It is the occupation with an intent to claim against the true owner, which renders the entry and possession adverse." Angell on Limitations, sec. 390.

There must be a *disseisin*, an ouster, a wrong amounting to a trespass, sufficient to give a cause of action. Surely the payment of taxes, or a professed conveyance, does not constitute such a trespass as to give a cause of action.

The complainant has not proved that he paid any taxes prior to 1870, but relies upon the presumption that they were paid by Todd. But the presumption is the other way. It would be presumed that some legal owner paid such taxes.

"Every presumption is to be made in favor of the true owner." Angell on Lim., sec. 385.

"Mere possession would be presumed to be in subordination to the real title, as the law never presumes a wrong." *Id.*

"The law presumes the person having the legal right to be in possession and seisin until ousted by one having a claim of right." Angell on Lim., sec. 384, cites 6 Peters, 743; 5 Id., 354; 2 Wh., 29; 8 Cow., 589.

"Survey, allotment and conveyance of a piece of land and the recording of the deed, does not constitute disseisin, without an open occupation." Angell on Lim., sec. 390.

As to what constitutes adverse possession see further 26 Am. Dec., 102 *n.*

In Ewing *vs.* Burnett, 11 Peters, 42, upon the prayer of the defendant, the court charged the jury that payment of taxes and speaking publicly of the claim, was not suffiicient evidence of claim of right, and this was sustained.

"Payment of taxes, though it may extend the limits of an adverse possession, does not constitute it. Like any other voluntary payment of another's debt it gives no right or advantage against the owner. There must be along with it an actual occupancy of at least a part of the land, and for half the period there was no such occupancy before us." Sorber *vs.* Willing, 10 Watts, 142.

In Reed *vs.* Field, 15 Vermont, 672, it was held that tax deed of fifty years and payment of taxes under color of a tax collector's deed, was not sufficient to show even color of title, without also proving the preliminary requisites of such deed.

See also Naylor *vs.* Albright, 4 Whart., Pa., 291; Chapman *vs.* Templeton, 53 Mo., 463; 4 Watts & Serg't, 36; Jackson *vs.* Tendlow, 3 John., 388; Angell on Lim., sec. 396.

One of the reasons given for the necessity of a notorious occupation is that the running of the Statute of Limitations is founded upon the theory of acquiescence; (Angell on Lim., sec. 392); and there could be no idea of acquiescence without knowledge by the legal owner. Of course mere payment of taxes, even if there were any evidence of such payment, could give no notice.

The principal defects of the tax sale and deed were that there was not legal notice, and it was not made legally a matter of record. Besides, no tax deed made out as this was gives any one any notice, the grantor being the mayor, &c., of Washington, and the name of Stephenson not appearing in the index; and no report, by the collector of taxes, of said sale was placed upon the land records of the county as required by law.

There was no actual notice of any claim of title by the complainant, or of any person whatever, as against the heirs of Stephenson; and, as we have seen, nothing equivalent to any notice of such claim. There was no record of a sale for taxes as required by law; the alleged tax deed, made fourteen years thereafter, was not recorded according to law, and certainly there was nothing to call attention to the decree of the Baltimore county court. The heirs of Stephenson having the legal title were, constructively, at least, in possession until ousted, and if any such ouster has taken place they never knew it.

The claim of adverse possession against these heirs is certainly unsustained by any presumption of payment of taxes, which is the sole ground of complainant's claim.

Mr. Justice WYLIE delivered the opinion of the court.

This is a bill to quiet the title to the west half of lot 3 in square 780. The bill was filed the 19th of September, 1883. The plaintiff claimed under a tax title, and some mesne conveyances. The defendants claim under the real title. The property was vested in James S. Stevenson in his life time, and he died about the year 1811, seized. The defendants are all heirs at law of James S. Stevenson. It is a claim, then, of the party who holds the tax title under the corporation of Washington against the heirs who hold the real title.

The tax title is briefly this: This piece of property was sold for $1.42, in the year 1827, for taxes due for the years 1824, 1825 and 1826. No tax deed was ever made for this property to the purchaser for thirteen years, and then, in 1841, the tax deed was made in pursuance of the sale which took place in the year 1827, and no possession was taken by the purchaser, or by any person claiming title under this tax sale, until 1870. The tax title had passed by many conveyances through different hands, amongst others William B. Todd, well known in this District as a dealer in tax titles. In 1870 these plaintiffs took possession of the property.

The lot lay out in an unimproved part of the city, and although we have no evidence of the .fact, it is very prob-able, from the lights we have, that the intermediate taxes, after the tax sale in 1827, had been paid by either the original purchaser at the tax sale, or by those who claim under the purchaser. There is no evidence that these heirs ever paid the taxes, which were very small. The bill does not aver that this was a valid tax sale, and there is no proof to establish its validity. But the theory of the bill is that, whether the tax sale was valid or not, the deed under it gave a colorable title. It was necessary, if the plaintiff re-lied upon the validity of the tax title, that he should show it. A tax deed of itself proves nothing. There are statutes in some States which declare that a deed given by an officer who is authorized to give a tax deed, gives a title *prima facie* good. But we have no such law. In this District, a man who claims under a tax title must show it to be good just as a man who claims under a deed from the marshal cannot make out any title on the face of the deed. The marshal's deed itself gives no title, because the marshal is acting under an authority, and his authority to make a deed must be shown, and to establish that authority it is neces-sary to give in evidence the judgment and the execution, and show the authority of the marshal to make the deed. So in regard to a public officer who sells property for the non-payment of taxes. His deed, on its face, amounts to nothing. His authority for making the deed must be shown; otherwise it is a void act.

As we have said, the bill does not aver a good tax title. It is merely claimed that it was a colorable title. But a color-able title is generally a void title in itself. A party who claims to enter under color of title, and by length of adverse possession gains a good title, will hold according to the metes and bounds set out in his colorable title, and that is the only effect of his color of title. The entry in the first instance may be that of a mere trespasser, without colorable title, but if he remains in adverse possession twenty years he gains a title—but his title is only for exactly the land that he

claims and stands upon—that he has actual possession of But if he had entered under a color of title, and his deed sets out by metes and bounds the property, then his possession of a part of the land would extend in contemplation of law to the whole, if he has possession long enough to give him title to the whole tract.

It is a very liberal concession to the complainant in this case to say that he has a colorable title. For if the face of the tax deed shows that it was absolutely void it does not even give color of title, and in this case there is strictly nothing to show that this tax deed amounts to anything at ll. But assuming that the complainant has a color of title, as it is claimed, it is only colorable, for he has made out no title under the tax deed. The fact that he has a tax deed, that the tax deed was recorded and that he has paid the taxes on the property, is no proof of title at all as against the real owner. In this case there was no actual possession until the year 1870, and from that date we have thirteen years of adverse possession by the complainant. But thirteen years of adverse possession does not make a title. It requires twenty years of adverse possession to make a good title, and that possession must be open, notorious and actual, not constructive. Payment of taxes does not amount to adverse possession; nor does recording a deed amount to it, and for the reason that it is not visible, open and notorious, and more it is not actual. There is not an authority in the books which supports or gives countenance to the pretext that a man can be ousted of the title to his property by some other person paying his taxes, and by simply getting a tax deed for the land. The tax deed must either be valid or there must be actual, open, notorious, visible adverse possession against all the world for twenty years. It is not necessary that a mere fence should be about it, but there must be actual, open and notorious possession of the property.

We do not find the statute, which is in force here, in regard to adverse possession either in Thompson's Digest or in Kilty's Laws of Maryland. Our statute is the statute of

21 James, ch. 1, sec. 16. It is to be found in Alexander's British Statutes, but you will not find in Thompson's Digest or Kilty any statute on the subject of adverse possession. The statute of James declares that no man shall be deprived of his right to enter upon his land except by an adverse possession of twenty years. Some of the States have their own statutes upon the subject which prescribe twenty-one years, but we have no statute of our own except this English one, which has always been held to be in force here. In this case there has been an adverse holding for thirteen years only. So that there is no title by adverse possession.

- To meet these difficulties, the complainant avers that he has a right to be considered in possession of the property, because the tax deed was recorded in 1841, and that gives him color of title, and that he has been paying taxes upon the property himself, and those under whom he claims have also paid taxes; but that cannot eke out adverse possession, because the payment of taxes and the recording of the deed are no part of adverse possession. The complainant, therefore, so far as this court can see, has no title upon this record, either under the tax sale or by means of adverse possession. That is enough to dispose of this case, but we wish to say something about these applications to quiet title, in regard to which courts have always been very exact.

Courts of equity will never interfere between two claimants to a piece of real estate, for the purpose of quieting title, unless the complainant shows a clear and indisputable title, but will leave him to any other remedy that he may have.

In Alexander and others *vs.* Pendleton 8th Cranch, 462, Chief Justice Marshall says that "the prayer of the bill ought not to be granted in a doubtful case" to quiet title. And in Orton *vs.* Smith, 18th Howard, 265, Mr. Justice Grier says: "Those only who have a clear, legal and equitable title to land, connected with possession, have any legal right to claim the interference of a court of equity to give them peace or dissipate a cloud upon the title."

It is a mere flight of imagination, upon the part of counsel for complainant in this case, it seems to us, to assume that there is shown in this case such a clear, legal and equitable title to the property in question, accompanied by possession, as to call for the intervention of this court. It is said that the court should interfere in a case of this kind, where the plaintiff has possession, for the reason that he cannot bring an action of ejectment. He cannot bring the case to issue, but must stay there in possession and wait an attack from the other party. In other words, being in possession, he must either stay until adverse possession completes his title, or he must be without a remedy.

Well, that is an appeal which might be made to the legislature, and we see, in looking through the cases, that in one of the States—the State of Ohio—they have a statute which meets the case. There any party in possession who wishes to clear his title may, without waiting for the completion of his title through adverse possession, file his bill against all persons whom he may name whom he charges with having adverse claims, and he can bring them into court for the purpose indicated, at any time. That probably is a very salutary statute; but we have no such law here.

Purchasers at tax sales have never been very much favored. Here the original sale was made in 1827 for taxes due in 1824, 1825 and 1826, and this property was sold for $1.42. But the complainant says that he has paid a large sum of money for this property; and it is claimed that this gives him a strong equity. We do not think so; every man who buys under a tax title knows that he is buying something that he is obliged to defend.

Here the original sale was for a dollar and forty-two cents, and no deed was made in pursuance of this sale until 1841. Whether any changes in the tax office took place in the meantime, or whether the officer who made the sale in 1827 was the officer who made the deed, or whether the forms of law were complied with in regard to the sale, in any respect, we do not know, because upon none of these matters have we any evidence, and no court of equity is to presume very

strongly in favor of a tax title.   A party who purchases
from others who hold a tax title, purchases with full knowl-
edge that he is running a risk, and he is bound to know
whether the tax title is good or not.   He buys with his eyes
open.   To no person does the rule *caveat emptor* apply more
than to the purchaser of a tax title.   The intermediate own-
ers of this tax title died, and, among others, William B. Todd,
and generally when a man dies seized of real estate, and
leaves it to his heirs, it is some presumption in his favor.
But there is no presumption at all in favor of the validity
of a title which is descended from a deceased ancestor,
unless that ancestor died seized.   None of these inter-
mediate tax owners of this property ever died seized of
this lot.

We think on every ground that the bill ought to be
dismissed.   That was the decree below, and we affirm the
decree.